UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHNNA K. McCORMICK,

    Plaintiff,

v.

PACIFIC BELLS, INC., a Wasington corporation, and THOMAS COOK, an individual

    Defendants.

No. C 08-5361 KLS

ORDER ON SUMMARY JUDGMENT

This matter comes before the Court on the Defendants' Motion for Summary Judgment (Dkt. 32) in which they request this Court to dismiss Plaintiff's claims for *quid pro quo* sexual harassment, hostile work environment sexual harassment, wrongful termination, intentional infliction of emotional distress and negligent infliction of emotional distress which are included in the First, Second, Third, Fifth and Sixth Claims of her Complaint. The Plaintiff filed her reply (Dkt. 37 - 39) and the Defendants filed their response (Dkt. 41 - 42).

For the reasons set forth below, the Court is granting the Defendants' motion to dismiss Plaintiff's claims based on *quid pro quo* sexual harassment and negligent infliction of emotional distress. The Court is denying the Defendants' motion to dismiss the Plaintiff's claims of hostile work environment sexual harassment, wrongful termination and intentional infliction of emotional distress.

Order on Summary Judgment
Page - 1

**UNDISPUTED FACTS**

For purposes of this summary judgment motion only, the Defendants stipulate to the following undisputed facts:

Johanna K. McCormick was hired to serve as a part-time nanny for Thomas Cook and his wife Sue in December 2001. Sue Cook and Johanna K. McCormick are sisters. Initially the Plaintiff served as a nanny on a part-time basis. She would go on family trips with the Cooks and help take care of the children. During this time Johanna McCormick resided in California.

Beginning in June or July of 2002 the Plaintiff became a full-time employee of Pacific Bells, Inc., a corporation for which Thomas Cook serves as its president and CEO. In order to work as a nanny full time the Plaintiff moved to Vancouver, Washington from California. It is undisputed, for purposes of this motion, that during all relevant times Thomas Cook was the Plaintiff's supervisor. The Plaintiff's job, even though she was on the payroll for the corporate defendant, was to serve as a nanny for the two children of Thomas and Sue Cook. She served in this capacity even after the Cooks divorced in 2005. After the divorce the Plaintiff would be with the children either at Thomas Cook's home or at Sue Cook's home. She continued to serve as a nanny until April 2007.

All of the Plaintiff's claims arise from the alleged inappropriate conduct of Thomas Cook. The first inappropriate conduct occurred sometime in 2004 when Mr. Cook kissed and grabbed the Plaintiff's breasts (outside her clothing) while they were in the kitchen at the Cooks home. Ms. McCormick was surprised at his conduct as it came out of the blue. She denied any change in her relationship with Mr. Cook as a result of this incident. She did tell her husband about this incident.

The next incident of inappropriate conduct occurred in July 2006[1], in Mr. Cook's house, when Ms. McCormick was getting ready to go on a trip that day to Hawaii with Mr. Cook, his two children and Mr. Cook's girlfriend. Johanna McCormick was in the bathroom when Mr. Cook knocked on the door. The Plaintiff told him that she was not dressed. He told her, "It's okay, open the door." Ms. McCormick got dressed and then opened the door to find Mr. Cook standing there only wearing underwear and no shirt. He turned off the light in the room, rubbed against her from behind and touched one of her breasts over

---

[1] Jennifer Tuck testified the trip was July 2007 and the Plaintiff relies on Ms. Tuck's deposition to establish the date of the trip. It is likely, however, that the trip occurred around July 2006 as it is undisputed that the Plaintiff quit her employment in April 2007.

her clothes. He also forced her hand on his penis, outside his clothes. Ms. McCormick told him to stop, which he did, and then he left the room. About ten minutes later Mr. Cook again knocked on the door and without asking who was there the Plaintiff opened it. Mr. Cook was standing there, now dressed. He again entered the room, turned off the light and began rubbing up against the Plaintiff and again forced her hand on his penis, outside his clothes. According to Ms. McCormick, there was nothing different about this second visit from the first visit other than the clothes Mr. Cook was wearing.

The Plaintiff went on the Hawaii trip, despite these two incidents, because the trip was planned for that day and she knew she needed to go on the trip to help take care of the children. She again described his behavior as "out of the blue" as nothing like this had occurred since 2004. She also knew that Mr. Cook was going there with his girlfriend with whom he would be sharing a room and Ms. McCormick knew that she would be sharing a room with the two young children. Ms. McCormick needed the job and was worried about what would happen if I backed out of the trip at the last minute.

Sometime after returning from the trip to Hawaii and still in 2006, Mr. Cook told the Plaintiff that he wanted to have an affair with her. Mr. Cook would also "moan and he would constantly stare at my breasts and comment on my shirt that I was wearing." (Deposition of Johanna McCormick, Dkt. 39-2, p. 97). There is not, however, any more specific information regarding this conduct.

In March 2007 Ms. McCormick was home recuperating from surgery. She needed more vacation time after her surgery and she initially called her sister about this issue who told her to call Tom. The Plaintiff did so and told him she needed more time off and inquired as to whether she could use her vacation. He told her yes but he would have to see if she had vacation. It was clear to the Plaintiff that Tom Cook had no objection to her using vacation. If she had vacation left, he would authorize it. The Defendant called the night before the next inappropriate incident. In that phone call he told Ms. McCormick that she had her vacation but that he needed her to sign a piece of paper. He came to her house the next day with the paper for her to sign and this is when the next incident of which the Plaintiff complains occurred. When he arrived at the Plaintiff's home he had Ms. McCormick sign the paper and at some point after she signed the paper he gave her a French kiss. Following this kiss she told Mr. Cook to leave. As he was walking down the stairs to leave the house he said "I'm not taking no for an answer this time."

The final incident of which Plaintiff complains occurred April 19, 2007. On that date the Plaintiff was with the children at Mr. Cook's home. He called around 10:00 p.m. to advise Ms. McCormick that he was running late. When he arrived at his home Ms. McCormick knew the Defendant had been drinking as she could smell it. Mr. Cook told Ms. McCormick to come into the dining room and she did. He then pushed her back against the wall and put his hands on her face and forcibly stuck his tongue in her mouth. Ms. McCormick testified that this was the first "forcible" kiss from Mr. Cook. He grabbed her shirt, opened it up and started kissing her breast. She told him to quit and started walking towards the front door. Near the front door is a closet and Mr. Cook opened the closet door and told her to come in the closet. She refused. Mr. Cook then grabbed her hand and made her touch his penis, over his clothes. He also reached for her crotch and grabbed her thigh. During this time she was resisting Mr. Cook and trying to pull away. He followed her out of the house, pushed her up against the house and put his hands on her face and stuck his thumb on her throat. Ms. McCormick was finally able to get in her car and she drove away. Ms. McCormick believes that about ten minutes elapsed from the time Mr. Cook entered the house to when she got in her car and left.

Ms. McCormick worked the following day at Mr. Cook's home for a short period of time. She had a conversation with Mr. Cook that day but there was no inappropriate contact between the two of them. She also worked on Sunday, April 21, 2007 at Sue Cook's home. The following Wednesday or Thursday, the Plaintiff's husband left a voice mail message for Susan Cook advising that Johanna McCormick was quitting.

The Plaintiff experienced panic attacks and could not sleep so she was seen at urgent care the end of April 2007. Her difficulty sleeping lasted about six months. She kept reliving everything the Defendant had done over and over in her head and she could not leave her home alone because of her fear that she would run into the Defendant. Her doctor recommended she see a counselor but she did not do so as she could not afford one.

Dr. Fox appears to diagnose generalized anxiety disorder, panic attacks, insomnia and post-traumatic stress syndrome. (Dkt. 39-6) The undersigned notes that this medical record is not under oath. However, in light of the fact that the Defendants did not object to the Court's consideration of this exhibit, it will be considered by the Court for purposes of this motion only.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56 ( c), the court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp., v. Catrett,* 477 U.S. 317, 323 (1985).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita elec. Indus. Co. V. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Service In. V. Pacific Electrical Contractors Association,* 809 F.2d 626, 630 (9th cir. 1987).

## *QUID PRO QUO* SEXUAL HARASSMENT

Ms. McCormick alleges *quid pro quo* sexual harassment against the Defendants under federal (Claim One, Count One) and state law (Claim Two, Count One).

Under Title VII, it is an unlawful employment practice for an employer

> to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...

42 U.S.C. §2000e-2(a)(1).

*Quid pro quo* sexual harassment occurs "whenever any individual explicitly or implicitly conditions a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994).

In analyzing a claim for *quid pro quo* sexual harassment, the Court can apply either an objective or a subjective standard. *Id.* at p. 512. Under the objective standard, the Court must determine "whether a reasonable person in the accuser's position would have believed that he or she was the subject of quid

pro quo sexual harassment." *Id.* at p. 512. Under the subjective standard, the focus is on "whether the alleged harasser actually intended to subject the accuser to quid pro quo sexual harassment. . . . in addition, the fact-finder may consider other individual traits or characteristics known to the accused that may make the victim expecially or uniquely susceptible to quid pro quo sexual harassment." *Id.* at p. 512.

The Plaintiff is not asserting that Thomas Cook explicitly conditioned her job, job benefit or absence of a job detriment upon her acceptance of his sexual conduct. Rather, she asserts that such benefit or absence of detriment was implicit in Mr. Cook's conduct. Judge Reinhardt noted in the *Nichols* decision that in "attempting to determine whether implicit quid pro quo harassment has occurred, the key is often the verbal nexus. . . . The tighter the nexus between a discussion about job benefits and a request for sexual favors, the more likely that there has been an 'implicit' conditioning by the harasser." *Id.* at p. 513.

In support of her claim based on the Defendant's "implicit" conduct, the Plaintiff focuses on the incident in March 2007 when she requested additional vacation time that she needed in order to fully recuperate from her recent surgery. The uncontradicted testimony, however, is that Mr. Cook approved her request for the use of vacation time when she first inquired of him as to its availability. In her deposition testimony, Ms. McCormick testified that in response to her inquiry if she could use her vacation he said: "He would see if I had vacation, but yes." (DP of McCormick, p. 104). It was her understanding that if she had sufficient accrued paid leave "he would authorize it." (*Id* at p. 104). Mr. Cook then called the plaintiff the night before the March 2007 incident. He told her "[t]hat I had my vacation and that I needed to sign a piece of paper." (*Id.* at p. 105). It was the following day that Mr. Cook brought the paper over for her to sign, which she did. It was after she signed the paper that Mr. Cook kissed the Plaintiff. She told him to leave her house and on his way out he made the statement "I'm not taking no for an answer this time." (*Id.* at p. 101).

The uncontradicted testimony before this Court is that Mr. Cook approved the requested use of vacation time unconditionally *prior* to his going to the Plaintiff's house with no hint of conversation that she must comply with any sexual demands he might make in the future. The unwelcome kiss occurred after she signed the paper and there was no conversation that suggested he would only allow her to sign the paper if she acceded to his demands. Finally, the meaning of the statement attributed to him - "I'm

not taking no for an answer this time" - is unclear. This is a statement he made as he was leaving the Plaintiff's house. The Court finds a complete absence of any discussion about job benefits and a request for sexual favors.

The parties do not disagree that resolution of the *quid pro quo* sexual harassment claim under federal analysis yields the same result under an analysis of state law as Title VII cases are persuasive authority for the construction of RCW 49.60. The Court therefore **GRANTS** the Defendants motion to dismiss all of Plaintiff's claims alleging *quid pro quo* sexual harassment.

## HOSTILE WORK ENVIRONMENT

A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367 (1993). A claim of unlawful hostile work environment requires a showing that the plaintiff was: (1) subjected to verbal or physical conduct of a harassing nature; (2) that the conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1110 (9th Cir. 2000). To be actionable under Title VII, a hostile work environment must be both objectively and subjectively offensive.

In order to determine whether the conduct is sufficiently severe or pervasive, the Court is required to consider all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris* at p. 23.

This case has an unusual twist to it in that Ms. McCormick worked as a full-time nanny and her place of employment was in the home of the parents. After Thomas Cook and his wife divorced, then Ms. McCormick had two places of employment - the home of Sue Cook and the home of Thomas Cook. Taking the undisputed material facts in the light most favorable to the non-moving party, it is clear that Ms. McCormick was subjected to verbal and physical conduct of a harassing nature by Thomas Cook, that this conduct was because of her gender, and that the conduct was unwelcome.

The issue raised by the Defendants is whether this conduct "was sufficiently severe or pervasive to

alter the conditions of Ms. McCormick's employment and create an abusive working environment." This Court finds that facts presented are such that the granting of summary judgment is precluded. While the Plaintiff complains of an incident that occurred in 2004, she admitted in her deposition that there was no change in her relationship with the defendant as a result of that one incident. The kiss and inappropriate groping came out of the blue and was a complete surprise to her. However, after Sue and Thomas Cook divorced, there were additional incidents which were clearly inappropriate, physically threatening and humiliating. The conduct that this Court is focusing on for this motion occurred between July 2006 and April 2007 - a period of 10 months. Based on the undisputed facts cited above, it appears that Mr. Cook's inappropriate conduct and attitude toward the Plaintiff was changing - and not for the better. The morning they were leaving for a trip to Hawaii, he fondled the plaintiff's breast, forced her hand on his penis and rubbed his body against hers - all against her will, not once but twice. The first time this occurred he was wearing only his underwear. He was her supervisor, her ex-brother-in-law and the father of her niece and nephew. Clearly this conduct would be upsetting not only to the Plaintiff but to any reasonable woman. This was then followed, upon their return from Hawaii, with Mr. Cook telling the plaintiff he wanted to have an affair with her. This statement makes it clear that he wanted to have a future sexual relationship with her - even when he knew that she was married.

While the details are scant, Ms. McCormick also testified to the fact that the defendant would "moan and he would constantly stare at my breasts and comment on my shirt that I was wearing." In March Mr. Cook was at the Plaintiff's home and again kissed her. After this occurred she told the Defendant to leave and on his way out he said "I'm not taking no for an answer this time." While the meaning of this statement is ambiguous, one inference is that he is still going to pursue her in his quest to have an affair with her.

This culminated in the events which occurred on April 19, 2007. While it may be difficult to explain a situation such that the listener can understand its true meaning, according to Ms. McCormick, Mr. Cook assaulted the Plaintiff in his home on that date. He pushed her against the wall, put his hands on her face and forcibly stuck his tongue in her mouth, he opened her shirt and started kissing her breast; he grabbed her hand and forced it on his penis (over his clothes) and he reached for her crotch. He followed Ms. McCormick out of his house and again pushed her against the house, put his hands on her

face again and stuck his thumb on her throat. Mr. Cooks conduct that day was physically abusive, forceful and unwelcome - not only to Ms. McCormick but to any reasonable woman.

Based on these facts, it does appear that the Defendant's conduct was sufficiently severe and pervasive so as to create a hostile working environment. It is not difficult to understand why the Plaintiff felt that she could not return to work when her employer, supervisor and ex-brother-in-law exhibited such extreme and inappropriate conduct towards her.

The Court notes that analysis of the state claim results in the same conclusion. Therefore, the Defendants' motion to dismiss the Plaintiff's claims based on hostile work environment are DENIED.

The Defendants included a statute of limitations defense to the hostile work environment claim in their Reply (Dkt. 41). This was not asserted in their original motion even though the Defendants knew of the facts at that time. This issue was not properly raised in the motion and did not give the Plaintiff notice or an opportunity to respond. The Court does not consider this to be properly noted and will make no ruling in that regard.

## WRONGFUL DISCHARGE

In order to prove constructive discharge, the plaintiff must prove that the conduct of Mr. Cook made her working conditions so intolerable that a reasonable person would have felt compelled to resign and that she resigned because of the conditions and not for some other reason.

The facts that the Court relied on to deny the Defendants' request to dismiss the Plaintiff's claim of hostile work environment also dictate the result with regard to this claim. The Defendant's motion to dismiss the Plaintiff's claim of wrongful discharge is DENIED.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To establish the tort of Intentional Infliction of Emotional Distress, the Plaintiff must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff. *Dicomes v. State,* 113 Wn. 2d 612, 630, 782 P.2d 1002 (1989); *Reid v. Pierce County,* 136 Wn. 2d 195, 961 P.2d 333 (1998).

Again, considering all of the circumstances as well as the relationship (employer, supervisor, ex-family member) of the Plaintiff with the Defendant Cook, the Court is of the opinion that the conduct does rise to the level of extreme and outrageous conduct which, either intentionally or recklessly, inflicted

emotional distress on the Plaintiff. The Defendant argues that the Plaintiff did not experience "severe emotional distress." However, once the Plaintiff has made a showing that the conduct was extreme and outrageous, "it can be fairly presumed that severe emotional distress was suffered." *Kloepfel v. Bokor,* 149 Wn.2d 192, 202, 66 P.3d 63 (2003). Ms. McCormick has presented sufficient evidence regarding severe emotional distress so as to preclude the granting of summary judgment.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

To establish this cause of action, the Plaintiff must show: (1) that her employer's negligent acts injured her, (2) the acts were not a workplace dispute or employee discipline, (3) the injury is not covered by the Industrial Insurance Act, and (4) the dominant feature of the negligence claim was the emotional injury. *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 972 (9th Cir. 2002).

However, Washington courts "do not recognize a claim against an employer for negligent infliction of emotional distress ...'when the only factual basis for emotional distress [is] the discrimination claim.'" *Robel v. Roundup Corp.,* 103 Wash. App. 75, 10 P.3d 1104, 1113 (2000) (quoting *Chea v. Men's Wearhouse, Inc.,* 85 Wash. App. 405, 932 P.2d 1261 (1997)). It is clear that Ms. McCormick's claim for negligent infliction of emotional distress is factually based on her discrimination claim. The Defendants' motion to dismiss this claim is GRANTED.

## CONCLUSION

The Court hereby **GRANTS** the Defendants' Motion to Dismiss (Dkt. 32) the Plaintiff's claims based on *quid pro quo* sexual harassment and negligent infliction of emotional distress. However, the Court hereby **DENIES** the Defendants' Motion to Dismiss the Plaintiff's claims based on hostile work environment, wrongful discharge and intentional infliction of emotional distress.

DATED this 1st day of July, 2009.

Karen L. Strombom
United States Magistrate Judge

Order on Summary Judgment
Page - 11